DAVID A. AND LORETTA J. CROSS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; VICTOR C. GAZDAK AND HELEN GAZDAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cross
Docket Nos. 14482-90, 15282-90
United States Tax Court
T.C. Memo 1992-715; 1992 Tax Ct. Memo LEXIS 760; 64 T.C.M. (CCH) 1532; December 17, 1992, Filed Decisions will be entered for respondent. For Petitioners: John N. Moore. *
For Respondent: Dawn M. Krause. GALLOWAY
GALLOWAY
MEMORANDUM FINDINGS OF FACT AND OPINION GALLOWAY, Special Trial Judge: These consolidated cases were heard pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 182. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined *761 deficiencies in petitioners' income tax and additions to tax as follows: David A. and Loretta J. Cross
Docket No. 14482-90
Additions to Tax, I.R.C.
Section
Section
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
1986
$ 2,295.00
$ 114.75
[1]
Victor C. and Helen Gazdak
Docket No. 15282-90
Additions To Tax, I.R.C.
Section
Section
Section
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 6,217.00
$ 310.85
[1]
$ 1,554.25
After a concession by petitioners Gazdak, [2] the issues for decision are: (1) Whether petitioners are entitled to deductions for Bingo Leasing promotion expenses claimed on their respective business Schedules C for the year 1986; (2) whether petitioners *762 are liable in 1986 for additions to tax pursuant to sections 6653(a)(1)(A) and (B), and 6661 (applicable only to petitioners Gazdak); and (3) whether petitioners are liable for increased interest pursuant to section 6621(c)[3] with respect to a substantial underpayment for the year 1986. Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners David A. and Loretta J. Cross resided in Parma Heights, Ohio, and petitioners Victor C. and Helen Gazdak were residents of Mayfield Village, Ohio, when their *763 respective petitions were filed with the Court. FINDINGS OF FACT During 1986, Thomas Graham (Graham) of Graham & Associates and Ronald Berardinis (Berardinis) of Berardinis & Associates were associated together in business at 17 Church Street, Berea, Ohio (the Church Street address), as accountants, financial consultants, and tax shelter promoters. Graham was also a chartered (sales) representative of Structured Shelters, Inc. (SSI), which had been organized in 1979 for the purpose of marketing tax-advantaged investments on a nationwide basis to interested investors. See Rybak v. Commissioner, 91 T.C. 524, 525-526, 562 (1988). [4]
*764 Berardinis prepared petitioners' 1986 tax returns. He had been associated with Graham since 1984. Berardinis was a field and sales representative for Graham & Associates and assisted Graham in promoting and selling tax-advantaged investments. Berardinis was paid commissions by Graham for selling investments to individuals who were clients of Graham & Associates and Berardinis & Associates. Other entities affiliated in business with Graham & Associates at the Church Street address in 1986 were Sonya, Inc. (Sonya), and Fedco Trust Co. During 1986, Graham and Berardinis were soliciting clients to invest in a venture called the "Bingo Leasing promotion", which had been developed by Graham. Interested investors were initially furnished with a printed multi-page Business Opportunity Plan (BOP) to review. The cover sheet of the BOP disclosed that the investments had been sold since April 15, 1986. The cover sheet contained the following caveat: "THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REVIEWED WITH AN ATTORNEY OR FINANCIAL ADVISOR BEFORE YOU SIGN ANY AGREEMENT". The provisions of the BOP were described as "Disclosures Required By Ohio Law". Under the BOP, *765 Sonya was the seller/lessor. Graham and his wife Celeste Graham owned over 50 percent of the stock in Sonya. Graham, as President of Sonya, and Celeste Graham, as Secretary/Treasurer, were two of the four Sonya corporate directors. The BOP provided that Sonya as seller/lessor would perform the "acts or services" of "Leasing of Bingo games copyrights for the purpose of obtaining royalties on a production basis from Besst Bingo Card Company". The BOP also provided that the lease rental payable to Sonya by the lessee was $ 27,000 per year and that the rental "initial payments (were) not refundable". The BOP did not mention any tax advantages available to interested investors. Besst Bingo Card Company (Besst) of Canton, Ohio, was a corporation organized on July 17, 1985, by Ken McDougal (McDougal) to manufacture and sell printed Bingo cards and games. McDougal owned 50 percent of the stock in Besst. John Russ (Russ) owned the remaining 50 percent of Besst stock, which he had received in exchange for his capital contribution of the copyrights of 28 bingo games. On April 30, 1986, a Purchase Agreement was executed between Russ and McDougal as President of Besst, as sellers, and *766 Thomas Graham of Sonya, as purchaser. Under the terms of the purchase agreement, the sellers conveyed the 28 copyrights of Bingo games [5] to Sonya, for its sole and exclusive use. Upon execution of the purchase agreement, Sonya agreed to pay to the sellers the sum of $ 60,000 per copyright, a total of $ 1,680,000. The purchase agreement provided that Sonya would make a downpayment of $ 17,000 for each copyright. The total downpayment of $ 476,000 for the 28 copyrights of Bingo games was paid in full shortly after the date of the purchase agreement. The remaining balance owed by Sonya to Besst on its purchase of the 28 copyrights was $ 1,204,000. This amount was to be financed by the sellers at 10 percent simple interest for a term of five years, commencing on April 30, 1986, with full payment of the $ 1,204,000 to be made to Besst no later than April 30, 1991. Payment of principal and interest by Sonya to Besst during the 5-year term was "fixed at 50% of the sales proceeds from products developed from the copyrights", i.e., Bingo games. *767 The purpose of Sonya's purchase of the copyrights of Bingo games from Besst was to provide financial assistance to Besst in establishing its business of manufacturing and sale of Bingo games. To implement this purpose, a Production & Royalty Agreement (P&R Agreement) was also executed on April 30, 1986, between Besst and Sonya, which contained the following provisions: RECITALS
A. Sonya is the owner of various copyrights relating to bingo games and is in need of someone to print and market said bingo gamecards. B. Besst has available printing capacity and sales and marketing expertise which it wishes to offer to Sonya. NOW, THEREFORE, in consideration of the mutual covenants, promises and undertakings set forth herein, Besst and Sonya hereby agree as follows: I. Printing 1. Sonya grants to Besst the sole and exclusive right to print all bingo gamecards from Sonya's 28 copyrights. 2. Besst agrees to hold open and use 100% of its printing capacity for the sole and exclusive use of Sonya.
II. Sales
1. Sonya grants to Besst the sole and exclusive right to price, market and sell said bingo gamecards. 2. Besst agrees to use its best *768 efforts to market and sell said bingo gamecards and shall also pay a royalty of $ 1.06 per unit for all bingo gamecards sold. A unit is $ 3,000 gamecards. A gamecard is one card with a maximum of 25 numbers. * * *
* * * The term of the P&R agreement was to begin on April 30, 1986, and remain in force through December 31, 1991. In the event Besst failed to pay any of the royalties due pursuant to the P&R agreement and failed to correct the royalty default within 30 days after receiving a notice of default, Sonya could terminate the P&R agreement and sue Besst for damages. Upon the recommendation of Berardinis, and after reading the BOP, Loretta Cross (petitioner Cross), executed a Lease Of Personal Property (lease) on June 11, 1986, with Sonya, as lessor, by which Sonya leased to petitioner Cross the "absolute right to the use, possession, and control of the leased property during the Lease term". A schedule attached to the printed lease captioned "Description of Property", contained provisions concerning the rent to be paid by the lessee to the lessor, the term of the lease and the property subject to the lease. The lease schedule provided that petitioner Cross would *769 pay Sonya $ 3,375 rent for the year 1986, plus future annual rent payments from "50% of the gross sales proceeds of Bingo games for the subsequent five years" of the lease, which was to terminate on December 31, 1991. Under the lease schedule, petitioner Cross, by paying $ 3,375 rent in 1986, was to acquire a 12.5 percent leasehold "ownership interest" in "copyrighted Bingo game(s)". The lease schedule contained spaces for the "name" and registration "number" of the copyrighted Bingo games, but these spaces contained no entries. Petitioner Cross' interest in a copyrighted Bingo game was otherwise unidentified. Petitioner Cross did not know the name or subject matter of the Bingo game copyright she leased or the names of others who invested in the copyrighted Bingo game in which she acquired a 12.5 percent leasehold interest. Nor did petitioner Cross verify the number of Bingo game copyrights owned by Sonya and available for lease. Before petitioner Cross invested in the Bingo Leasing promotion, she did not consult an attorney or outside financial counselor concerning the propriety of an investment in that promotion. Nor did petitioner Cross inquire as to the existence of agreements *770 between Sonya and Besst which would relate to an investment made in the promotion. Petitioner Cross invested in the Bingo Leasing promotion by drawing a check for $ 3,375 rent [6] payable to Fedco Trust on June 6, 1986, and giving it to Berardinis. Fedco Trust was an account used by Graham & Associates for the deposit of investments received by clients. Prior to investing in the Bingo Lease promotion, petitioner Cross had worked for over 20 years as a supervisor for Ohio Bell Telephone. She had no experience in the Bingo game industry or in the leasing of copyrights. Petitioner Cross did not negotiate the terms of the lease agreement she signed, nor did she independently investigate or talk to another person not connected with the Bingo Leasing promotion after investing in that *771 venture. Petitioner Cross received no income from the Bingo Leasing promotion and relied solely on accountant/shelter promoters Berardinis and Graham for information concerning the activity and progress of her Bingo Leasing promotion investment. Petitioner Cross had met Berardinis in previous years when he worked at Ohio Bell Telephone. As part of her investment in the Bingo Leasing promotion, petitioner Cross on September 4, 1986, executed an Agreement For Appointment Of Advertising Agency with Marketing Complex, Inc. (MCI), in which she as "Advertisee" agreed to pay MCI $ 4,000 for advertising services. Petitioner Cross paid $ 375 cash to MCI on September 4, 1986, and executed a nonrecourse note totaling $ 3,625, for the balance due, payable over 60 months. No negotiations took place with MCI concerning the terms of the advertising agreement or the advertising services to be performed by MCI. Petitioner Cross did not receive a copy of the agreement she signed. Petitioner Cross made no payments to MCI pursuant to the terms of the nonrecourse note. Victor C. Gazdak (petitioner Gazdak), received from Berardinis and reviewed a Bingo Lease BOP prior to making an investment. Upon *772 Berardinis' recommendation, petitioner Gazdak invested in the Bingo Lease promotion on June 9, 1986, by drawing a check for $ 6,750 payable to Fedco Trust and giving it to Berardinis for deposit. According to petitioner Gazdak, this payment was made because he "leased a copyright" when he "made an investment in 1986 into Bingo Leasing". On December 30, 1986, petitioner Gazdak drew a check payable to Graham and Associates for $ 750. He noted on his check that the payment was a downpayment on Bingo Advertising and gave the check to Berardinis. Prior to investing in the Bingo Lease promotion, petitioner Gazdak was a United Parcel Service employee for 30 years. He had no experience in the Bingo game industry or in the leasing of copyrights and made no independent investigation of the viability of that industry or the promotion plan prior to making his investment by consulting an attorney or financial counselor not connected with the promotion. Petitioner Gazdak received no income from his Bingo Leasing promotion investment and relied solely on accountant/shelter promoters Berardinis and Graham for information concerning the activity and progress of his Bingo Leasing promotion investment. *773 Both petitioners Cross and Gazdak were advised that there would be tax advantages if they invested in the Bingo Leasing promotion. On their respective Schedules C attached to their 1986 returns, petitioners disclosed their business activity as "Investing-Various". Petitioners reported zero income and deducted the following expenses: Cross
Gazdak
Advertising
$ 4,000
$ 8,000
Equipment Lease Expense
3,375
6,750
Loss claimed
$ 7,375
$ 14,750
Respondent disallowed the above losses in her notices of deficiency with identical explanations: It is determined that the deductions claimed on Schedule C of your 1986 income tax return, in the total amount of $ 7,375.00 ($ 14,750.00) with respect to Bingo Game Printing, are not allowable since you have not established that the activity was engaged in for profit, constituted a trade or business, or involved property held for the production of income or that the activity had any economic substance.
Besst began printing Bingo cards in 1986. The company had continuous equipment problems with its printing press. In October 1987, Besst filed for creditor protection under Chapter 11 of the Bankruptcy Code. Besst continued *774 to remain in business through 1990 and produce and sell Bingo cards while under Bankruptcy Court protection. Besst's net sales of Bingo cards for the period 1987 through December 12, 1990, totaled $ 1,383,199.89. Sonya and Besst agreed that, pursuant to the royalty agreement, unpaid royalties due Sonya from Besst sales during this period totaled $ 366,549.06. Sonya notified Besst in writing of its royalty payment default on December 13, 1990, and agreed to allow Besst to continue using the Sonya copyrights as long as Besst remained in business and did not convert to Chapter 7 Bankruptcy status. On December 19, 1990, Sonya filed a proof of claim against Besst in the United States Bankruptcy Court for the Northern District of Ohio for $ 366,549.06, indicating on the claim that the debt was incurred "continuously from April 30, 1986 to December 12, 1990". As of the date of trial, Besst had discontinued business operations. OPINION 1. Bingo Leasing Promotion Expenses
The primary issue for decision is whether petitioners are entitled to deductions claimed based upon their investments in the Bingo Leasing promotion. Respondent argues that the Bingo Leasing promotion deductions *775 claimed are unallowable. Respondent principally contends that the documents executed [7] in transactions in which petitioners acquired interests in unidentified copyrighted Bingo games, and contracted for Bingo Leasing advertising services, should be disregarded for Federal income tax purposes as sham transactions lacking economic substance. Petitioners have the burden of proving that their 1986 Bingo Leasing promotions were not shams lacking economic substance and that the deductions claimed relating to those investments are allowable. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *776 Business transactions by their nature must have economic substance, that is, a realistic potential for profit. James v. Commissioner, 87 T.C. 905, 924 (1986), affd. 899 F.2d 905 (10th Cir. 1990). Here, the contracts and other documents relied on by petitioners must be structured so that petitioners would have some prospect of achieving a non-tax profit at the time they entered into the Bingo Lease promotion transactions. a. Economic Substance
(1) Investment In Copyrighted Bingo Game Leases
Petitioners claim that the economic substance of the portion of the Bingo Leasing promotion transactions in which petitioners acquired percentage leasehold interests in copyrighted Bingo games is supported by petitioners' lease agreements with Sonya and other documentary evidence. Petitioners argue that Sonya, after purchasing the copyrights "went to a number of investors looking for people to lease them and sublease them back to Besst Bingo". According to Berardinis, "the purpose of (petitioners') investment was to start this company called Besst Bingo, and investors would earn a profit based on the sales that are royalty *777 on their leases based on this investment". Petitioners' contentions are unsupported by the record. The P&R agreement covering payment of royalties was between Sonya and Besst. There is no evidence of a separate assignment of royalties by Sonya to petitioners or other investors which provides for the payment by Besst of royalties to petitioners as investors based on the sales of copyrighted Bingo games. McDougal did not know petitioners. He testified that although he understood there were other owners of copyrighted Bingo games, any agreements to pay said individuals "a return on their money" were made through Thomas Graham of Sonya, not Besst. We do not agree that petitioners have shown there was "economic substance" to the Bingo Leasing promotion transactions by their claim that one-half of the $ 366,549.06 royalty claim filed by Sonya in the Besst bankruptcy proceeding "was due to the various investors". There is nothing in the record disclosing that Sonya's claim against Besst for accrued and unpaid royalties included any amount to which petitioners would be entitled. Petitioners further argue that they leased "on a joint venture basis, a percentage interest in the rights *778 to a Bingo copyright, and thus the royalty income from the production of the bingo cards for the game resulting from that copyright." We disagree. The lease agreement gave petitioners a percentage leasehold interest only in unidentified Bingo game copyrights. Petitioners Cross and Gazdak did not know each other before the trial of this case. Petitioners did not know the names of the specific Bingo game copyrights in which they purportedly owned interests and the names of other individuals who had allegedly invested in the same copyrighted Bingo games. A joint venture has been defined as "an association of persons jointly undertaking some commercial enterprise". Black's Law Dictionary, 753 (5th ed. 1979). There can be no joint venture with unknown parties, nor can one receive royalties from an alleged leasehold interest in property which cannot be identified. Petitioners were required to pay rent to Sonya as lessee each year after 1986 "from 50 percent of the gross sales proceeds of Bingo games". To comply with this rental provision, petitioners would first have to receive from Besst gross sales proceeds from sale of some Bingo games by Besst. However, the P&R agreement contains *779 no paragraph that provides that petitioners could receive any of Besst gross sale proceeds from Bingo games, or as previously stated, royalties from the sale of Bingo games. Finally, we note that, contrary to petitioners' contention, the investment funds necessary to provide Besst with working capital came from Sonya, not from petitioners and others who invested in the Bingo Leasing promotion. The principal purposes of the purchase and P&R agreements of April 30, 1986, between Sonya and Besst were: (1) To provide working capital for Besst from the sale by Besst to Sonya of the copyrights; (2) to provide for future payments from Sonya to Besst of the installment portion of the purchase of the copyrights; (3) to provide for the printing, marketing, and sale of the Bingo cards by Besst for the benefit of Sonya; and (4) to provide for payment of royalties to Sonya on the printing and sale of Bingo cards. Fifty percent of the sales of Bingo games was first allocated to payment of substantial amounts due from Sonya to Besst upon its purchase of the copyrights. Accordingly, royalties, if they had been paid, were only subject to payment from the remaining 50 percent of Besst sales not *780 allocated to payment of principal and interest amounts due on sale of the copyrights. The transactions involving petitioners' acquisition of leasehold interests in copyrighted Bingo games were not structured so that petitioners would have some prospect of achieving a non-tax profit at the time they invested in the Bingo game leases. We conclude from the lack of potential profit available to petitioners in the leasehold investment portions of the Bingo Lease transactions, that such transactions were shams and lacked economic substance. b. Investment In Advertising Contract
Petitioners claim that the economic substance of the advertising portion of the Bingo Leasing promotion should be considered "separate and apart from the bingo lease". Petitioners argue that "the investors in this particular investment felt that they would prosper better if they were able to obtain some advertising for the investment". However, petitioners' only activities with respect to this portion of their investments were payments to MCI for purported advertising services, and the execution of nonrecourse notes payable to MCI. Petitioners were not authorized to provide advertising services to promote *781 sale of Bingo games since the P&R agreement gives Besst, not petitioners, the authority to market and sell Bingo games. We conclude that petitioners' advertising portions of the Bingo Leasing promotion transactions were also shams and lacked economic substance. Petitioners failed to call as a witness Thomas Graham, the only person who may have been able to testify as to the claimed economic substance (with respect to petitioners), of the Bingo Leasing promotion transactions, by explaining the provisions of the various agreements between Sonya and Besst, between Sonya and petitioners, and the relationship of petitioners as investors to Sonya and Besst. Graham was present as petitioners' witness before the trial began. Petitioners' attorney unsuccessfully argued that Graham should not be excluded as a witness under Rule 145(a) because "he is somebody that's necessary and advantageous to me to help put on the case". Petitioners' attorney later advised the Court that he would not call Graham as a witness. We infer that Graham's testimony, if he had been called, would not have been helpful to proving that the Bingo Lease promotion transactions entered into by petitioners were not *782 shams and lacked economic substance. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We conclude that petitioners' Bingo Lease transactions were shams and lacked economic substance. b. Section 165 Loss
Petitioners claim that the disputed deductions supported by cash payments are allowable even if the Bingo Lease promotion transactions involving Sonya and Besst are found to be shams and lacking economic substance. Petitioners assert that "the transaction between Sonya and Besst has nothing to do with the deductability (sic) of the petitioners' expenses". Petitioners are essentially arguing that the deductions supported by cash payments must be allowed as out-of-pocket expenses under section 165(c)(2). Section 165 provides as follows: (a) GENERAL RULE. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) LIMITATION ON LOSSES OF INDIVIDUALS. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- * * * (2) losses incurred *783 in any transaction entered into for profit, though not connected with a trade or business; * * *
Section 1.165-1(b), Income Tax Regs., provides: "To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * *actually sustained during the taxable year." As stated previously, Graham has been a tax shelter promoter for many years. Graham has been involved in numerous tax shelter cases before this Court where the parties agreed that the transactions related to the disputed investments were shams and had no economic substance, and in which the taxpayers had unsuccessfully contended they were entitled to deductions under section 165(c)(2) for "out of pocket expenses". See Hauser v. Commissioner, T.C. Memo. 1992-641; Ward v. Commissioner, T.C. Memo 1992-640; [8]Ryall v. Commissioner, T.C. Memo. 1992-103; Foys v. Commissioner, T.C. Memo. 1992-81; Sharbek v. Commissioner, T.C. Memo 1992-87; Cullin v. Commissioner, T.C. Memo 1992-71; *784 Parson v. Commissioner, T.C. Memo. 1992-70; Menardi v. Commissioner, T.C. Memo. 1992-57; Hattersley v. Commissioner, T.C. Memo. 1992-55. Petitioners have failed to establish a profit motive by investing cash in the Bingo Leasing promotion. In King v. United States, 545 F.2d 700, 708 (10th Cir. 1976), the court held that "The reason underlying the need to establish profit motivation is that the ordinary loss deduction allowed by § 165(c)(2) was not intended to extend to a transaction lacking economic substance, amounting to nothing more than a sham." Because we have held that the Bingo Leasing transactions are shams and lacked economic substance, petitioners cannot prevail notwithstanding *785 their professed profit motive. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987), where this Court held that the presence of a taxpayer's individual subjective profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance. In Jackson v. Commissioner, T.C. Memo. 1991-250, affd. 966 F.2d 598 (10th Cir. 1992), we denied a deduction for "out of pocket cash losses" on the ground that the transaction lacked economic substance and stated that subjective intent of a profit cannot supply economic substance to a business transaction. Moreover, in Shriver v. Commissioner, 899 F.2d 724, 727 (8th Cir. 1990), affg. T.C. Memo. 1987-627, the court concluded, as an alternative basis for sustaining the denial of deductions claimed, that where there is a clear finding of a lack of economic substance it is enough, standing alone, to support a decision that a deduction is not allowable. In Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985), *786 the Court of Appeals held that if a transaction is a complete sham, then such niceties as whether the test (for whether a transaction is "entered into for profit") is an objective or subjective one are simply not involved. Regardless of the definition, the transaction must be bona fide before losses are deductible. We conclude for the above reasons, that petitioners are not entitled to deductions in the year 1986 for their cash payments invested in the Bingo Leasing promotions under section 165(c)(2) because the transactions in question were shams and lacked economic substance. Respondent is sustained on this issue. 2. Additions to Tax
a. Section 6653(a)(1)(A) and (B)
Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). Section 6653(a)(1)(A) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is defined as the lack of due care or failure to do what a reasonable *787 and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners Cross and Gazdak claim that they should not be liable for the negligence additions to tax because they relied on the alleged tax and investment expertise of accountants Ronald Berardinis and Thomas Graham before making their Bingo Leasing investments. Here, when petitioners were advised by Berardinis and Graham of the Bingo Lease promotion as an investment opportunity, they were given a BOP concerning details of the Bingo Lease promotion transaction. However, as indicated above, petitioners did not become familiar with the lease provisions concerning their purported acquisition of percentage ownership interests in copyrighted Bingo games, or the involvement of Sonya and Besst in the Bingo Lease promotion. Petitioners made no independent investigation of the financial aspects of the Bingo Leasing promotion with respect to their investment. Petitioners made no inquiry of an outside attorney, *788 accountant, or investment counselor concerning the Bingo Leasing promotion investment opportunity. They had no profit objective in investing in the Bingo Leasing promotion. The failure of petitioners to make a meaningful investigation beyond the promotional materials or to consult independent advisors known to be experienced in the tax or investment fields was not reasonable or in keeping with the standard of the ordinarily prudent person. LaVerne v. Commissioner, 94 T.C. 637, 652 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. 956 F.2d 274 (9th Cir. 1992). There is no evidence that accountant/shelter promoters Berardinis and Graham had more than limited knowledge of the production and sale of Bingo games. Accordingly, petitioner's reliance on their advice regarding the business aspects of this program cannot be regarded as reasonable. See Rogers v. Commissioner, T.C. Memo. 1990-619. We conclude therefore that the additions determined by respondent under section 6653(a)(1)(A) and (B) must be sustained. *789 b. Section 6661(a)
Respondent has also determined that the addition to tax under section 6661 applies in this case to petitioner Gazdak. Respondent contends that the deductions claimed on petitioner Gazdak's return are attributable to a tax shelter and that petitioner Gazdak is liable for the addition to tax since he has failed to show that there was substantial authority for his position and that petitioner Gazdak reasonably believed the tax treatment of the items questioned was proper. We agree with respondent. Sec. 6661(b)(2)(C)(i). We also hold that petitioner Gazdak has failed to show that respondent abused his authority in not waiving the addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). There is no showing of reasonable cause by petitioner Gazdak for the understatement and that he acted in good faith. To the contrary, we have found that petitioner Gazdak was negligent in claiming the deductions and failed to make a good faith effort to determine the proper tax treatment of the tax items involved. See Mailman v. Commissioner, supra.
3. Increased Interest
Section 6621(c)(1) *790 provides that "In the case of interest * * * with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest * * * shall be 120 percent of the underpayment rate". Section 6621(c)(2) defines a substantial underpayment attributable to tax motivated transactions as "any underpayment of taxes * * * which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000." Section 6621(c)(3)(A)(v) defines a tax motivated transaction to include any sham or fraudulent transaction. We hold that respondent has met her burden of showing that petitioners Cross and Gazdak are liable for the increased interest under section 6621(c). The increased interest under the provisions of section 6621(c) is applicable because we have held that the Bingo Leasing promotion was a sham and fraudulent transaction, lacking economic substance. Sec. 6621(c)(3)(A)(v). McCrary v. Commissioner, 92 T.C. 827, 857 (1989); Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); *791 affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Decisions will be entered for respondent.
Footnotes
*. Brief amicus curiae was filed by Edward G. Ptaszek and Alexander J. Szilvas for movants John and Jean H. Bebbington, Dan and Kathleen Davis-Booth, Renato and Juliet L. Bosita, J.F. and Angela Cutrone Bradley, Wayne E. and Geraldine A. Helfrich, Michael and Marlette L. Heryak, William (Deceased) and Rosalie C. Kuns, Carl W. Goldbeck, James R. and Loretta M. Nicolai, Robert I. and Betty L. Nicolai, Robert W. and Linda S. Nicolai, Buster A. and Lisa L. Parker, Frank A. and Colleen G. Pellerito, Megan E. Ryan, Michelle M. Ryan, William J., II. and Ann M. Ryan, William J. Ryan III, Robert H. and Rita M. Schwarz, and Felix A. (Deceased) and Adele R. Spittler.↩
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
2. Respondent disallowed a deduction for "Planning Fees" amounting to $ 1,155 claimed on the 1986 tax return of petitioners Gazdak. This issue was not addressed by petitioners Gazdak at trial and is deemed conceded.↩
3. Respondent affirmatively alleged in her answers that petitioners are liable for increased interest pursuant to section 6621(c). Respondent has the burden of proof on this issue. Rule 142(a)↩.
4. Thomas Graham has acted as an SSI representative in marketing various tax-motivated investments for other taxpayers who have appeared before this Court. See Ryall v. Commissioner, T.C. Memo. 1992-103; Foys v. Commissioner, T.C. Memo. 1992-81; see also Ward v. Commissioner, T.C. Memo. 1992-640; Hauser v. Commissioner, T.C. Memo. 1992-641↩.
5. A list of the 28 Bingo games by name and copyright registration number was attached to the purchase agreement.↩
6. The yearly lease rental for one bingo game copyright was $ 27,000 per year. Petitioner Cross paid 12.5 percent of $ 27,000, or $ 3,375 for her proportionate 12.5 percent leasehold interest in the unidentified copyrighted bingo game.↩
7. We agree with respondent that there is no independent documentary evidence supporting petitioner Gazdak's testimony that his 1986 cash investments in the Bingo Leasing promotion were for the lease of a copyright and a downpayment for advertising services, as in the case of petitioner Cross. However, for ease of discussion of this issue, we will assume that petitioner Gazdak did execute contracts in 1986 similar to those entered into by petitioner Cross. If petitioner Gazdak had executed a lease of property after reviewing the BOP, he would have acquired a 25-percent leasehold ownership interest in an unidentified Bingo game.↩
8. In Ward v. Commissioner, T.C. Memo. 1992-640↩, the parties stipulated that the taxpayers' investment in a Bingo Leasing promotion transaction was a sham and lacked economic substance.